# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| Federal National Mortgage Association, | Civil No. 12-2953 (SRN/JJG) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER** |
| Andrew C. Grossman; Andrew Grossman Revocable Trust, under agreement dated June 23, 2005; ABCO Research, LLC; Venerable Group, LLC; Ambient Consulting, LLC; and Grossman Investments, LLC, | |
| Defendants. | |

---

Frank Visciano, Senn Visciano Canges P.C., 1700 Lincoln St., #4500, Denver, CO 80203; Charles F. Webber, Adam M. Nodler, Faegre Baker Daniel LLP, 2200 Wells Fargo Center, 90 South Seventh St., Minneapolis, MN 55402-3901, for Plaintiff.

Mark R. Bradford, Bassford Remele, P.A., 33 South Sixth St., Suite 3800, Minneapolis, MN 55402, for Defendants Andrew C. Grossman and Venerable Group, LLC.

Daniel N. Rosen, Parker Rosen, LLC, 888 Colwell Building, 123 North Third St., Minneapolis, MN 55401, for Defendants ABCO Research LLC, Ambient Consulting, LLC, and Grossman Investments, LLC.

---

SUSAN RICHARD NELSON, United States District Judge

This matter is before the Court on the motion for partial summary judgment brought by Defendants Andrew C. Grossman, ABCO Research, LLC ("ABCO"), Venerable Group, LLC ("Venerable"), Ambient Consulting, LLC ("Ambient"), and Grossman Investments, LLC ("Grossman Investments") (Doc. No. 27).  For the reasons stated below, this Court denies the motion.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

In 2007, Plaintiff Federal National Mortgage Association ("Fannie Mae") obtained

two Oklahoma state-court judgments against Defendant Andrew C. Grossman personally,

and recorded each, in November 2007 and April 2011, respectively, in Minnesota, where

Grossman resides.  The judgments originally were in excess of $16 million, and the

outstanding balance is in excess of $10 million.  Although Grossman had substantial

assets–including membership interests in four limited liability companies–ABCO,

Venerable, Ambient, and Grossman Investments (collectively, the "LLC

Defendants")–Fannie Mae has not been able to recover in full on those judgments.[1]  In

---

[1]      A Limited Liability Company (LLC) is a type of business entity that shares some of the features of a partnership, but that also shares some of the features of a corporation.  For example, like the shareholders of a corporation, "a member, governor, manager, or other agent of a limited liability company is not, merely on account of this status, personally liable for the acts, debts, liabilities, or obligations of the" LLC.  Minn. Stat. § 322B.303, subd. 1.  But the law of corporate veil-piercing "also applies to limited liability companies."  Id., subd. 2.  An LLC's "business and affairs" is "managed by or under the direction of a board of governors."  Id. § 322B.606, subd. 1.  The board consists of one or more governors.  Id. § 322B.61.  Furthermore, an LLC must have at least one "member."  Id. § 322B.11.  The members are the owners of an LLC.  Id. § 322B.03, subd. 35.  A member's "membership interest" (or "ownership interest") consists of the member's "financial rights" and "governance rights," as well as the rights to assign those respective interests.  Id. § 322B.03, subd. 31.  A member's "financial rights" includes, as relevant here, the right to share in profits and losses, and to share in distributions.  Id. § 322B.03, subd. 19.  The profits of an LLC, as well as any distributions of cash or other assets of the LLC, generally are allocated among the members in proportion to their relative contributions to the entity.  Id. §§ 322B.326, .50.  A member's "governance rights" generally include all rights other than the member's financial rights.  Id. § 322B.03, subd. 22.  Members own "some governance rights," but a member need not have voting rights.  Id. § 322B.03, subd. 30.  A member's interest in the LLC is the personal property of the member, who holds no interest in the specific property of the LLC, which remains the property of the LLC as an entity.  Id. § 322B.30, subd. 1.  Finally, an LLC must have one or more persons exercising the powers of "chief manager

(continued...)

September 2008–after Fannie Mae obtained the two Oklahoma judgments–Grossman

established the "AG 2008 Trust" under the law of the Cook Islands ("the Cook Islands

Trust" or "the Trust").  Grossman then transferred the majority of his assets–all of

Grossman's membership interests in the LLC Defendants,[2] which were worth several

million dollars[3]–to the Cook Islands Trust.[4]  The present beneficiaries of that trust are

Grossman himself and the "Defendant Andrew Grossman Revocable Trust" (the

"Grossman Trust").  Plaintiff alleges that trusts established under the law of the Cook

Islands, which are located in the South Pacific Ocean, serve as well-known vehicles for

sheltering assets from United States creditors.  (Doc. No. 1, ¶ 33.)  And as Fannie Mae

---

[1](...continued)
and treasurer."  Id. § 322B.67; see id. § 322B.673, subds. 2, 3.  An LLC may elect or
appoint "managers."  Id. § 322B.20, subd. 18.  A "manager" generally is the chief
manager and the treasurer, id. § 322B.03, subd. 29, and the same person may hold or
exercise "[a]ny number of managerial positions," id. § 322B.679.

[2]     The parties refer to these transfers as simply transfers of Grossman's
"membership interests."  But while a member of an LLC may transfer his "financial
rights" quite freely, any transfer of his "governance rights" is more restricted.  Minn. Stat.
§ 322B.31, cmt., subd. 1 ("Chapter 322B allows free transferability of financial rights, in
sharp contrast to the chapter's restrictive approach to the transfer of governance rights
and complete membership interests.").

[3]     Although there is some lack of clarity in the record as to the value of
Grossman's membership interest in each of the LLCs, the parties agree that the total value
of the interests Grossman transferred to the Trust was several million dollars.
Grossman's "recollection" of the value of his interest in ABCO is "around a million
dollars."  (Doc. No. 85, Ex. 7 at 14 (Depo. at 44:14-24), 15 (Depo. at 49:4-6).)  And at
oral argument, counsel for Fannie Mae asserted that Grossman's membership interest in
Ambient alone is worth $5.5 million.

[4]     Grossman also transferred certain IRA proceeds to the Cook Islands Trust.
But those funds are not at issue with respect to the present motion.

learned after filing its Complaint, the LLC Defendants then distributed several million dollars to the Cook Islands Trust.[5]

Fannie Mae thus filed the present action seeking to recover the unpaid balance on the two judgments it obtained against Grossman, alleging that Grossman fraudulently transferred his interests in the LLC Defendants to the Cook Islands Trust in order to evade his creditor's attempts to satisfy the judgments.  Fannie Mae named as Defendants not only Grossman himself, but also the LLC Defendants.[6]  Fannie Mae seeks various forms of relief (substantially tracking that provided in the section of Minnesota's Uniform Fraudulent Transfer Act governing "remedies of creditors," Minn. Stat. § 513.47), including an order setting aside the transfer of Grossman's membership interests in the LLC Defendants as well as injunctive relief.  (Doc. No. 1, at 16-17.)

Grossman and the LLC Defendants (collectively, the "Moving Defendants") now move for partial summary judgment.[7]

## II.   DISCUSSION

---

[5]   For example, the cash distribution from Ambient was between $500,000 and $1,000,000.  (Doc. No. 85, Ex. 6, at 5-6 (Depo. at 11:24 - 12:2).)  At oral argument, Fannie Mae also asserted that discovery disclosed that Grossman Investment liquidated its assets before this action was filed, but not before it distributed what had been Grossman's share of the entity's distributions to the Cook Islands Trust.

[6]   Fannie Mae also brought this action against the Andrew Grossman Revocable Trust.  Fannie Mae included the Grossman Trust because it "has or may claim an interest as a beneficiary of the Cook Islands Trust."  (Doc. No. 1, ¶ 4.)  The Moving Defendants characterize it as a "nominal Defendant."  (Doc. No. 28, at 1 n.1.)

[7]   Defendant Grossman Trust does *not* join in the present motion.

Plaintiff's Complaint asserts two claims:  (1) a claim under Minnesota's Uniform Fraudulent Transfer Act ("MUFTA"), Minn. Stat. §§ 513.41-.51; and (2) a claim for injunctive relief.  The Moving Defendants first seek summary judgment with respect to the fraudulent transfer claim insofar as Plaintiff seeks remedies beyond the charging order provided under Minn. Stat. § 322B.32, which provides that such an order is the sole remedy a creditor such as Fannie Mae may obtain with respect to a debtor who is a member of a limited liability company.[8]  In the course of the briefing and oral argument in this matter, the Moving Defendants clarified that their request for relief seeks to have the LLC Defendants dismissed entirely from this action.  They also seek summary judgment on the claim for injunctive relief.  Other issues such as whether Grossman's transfers were in fact fraudulent remain for later adjudication.

### A.    Summary Judgment Standard

A party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  This Court must review the evidence, as well as any inferences that may be reasonably drawn from the evidence, in a light most favorable to Fannie Mae as the non-movant here.  E.g. Young v. Builders Steel Co., 754 F.3d 573, 577 (8th Cir. 2014).

---

[8]     ABCO and Venerable were organized under Minnesota law.  Ambient and Grossman Investments were organized as LLCs under the laws of Delaware.  Delaware law likewise limits such creditors to a charging order.  Del. Code Ann. tit. 6, § 18-703(d).

### B.     Limitation of Plaintiff's Claim Against The LLC Defendants To A "Charging Order"

Fannie Mae first asserts a claim for relief under the Minnesota Fraudulent Transfer Act against not only Grossman himself, but also against the LLC Defendants (as well as against the Grossman Trust).  Grossman and the LLC Defendants seek summary judgment with respect to this claim on the grounds that the Minnesota Limited Liability Company Act, Minn. Stat. § 322B.32, confines a creditor such as Fannie Mae to the remedy of a charging order, and thus expressly precludes relief in the form of "traditional collection remedies."  (Doc. No. 28, at 1-2).

They contend that while the Complaint names the LLC Defendants as parties, it does not "allege that any of the LLC Defendants engaged in tortious conduct or other wrongdoing."  (Id. at 4.)  They further contend that in light of the limitation of remedies to a charging order, the only issue is whether Grossman's membership interests in the LLCs were fraudulently conveyed to the trust, but that such an issue is not one "for which any of the LLC Defendants is a necessary party," particularly insofar as "none of the LLC Defendants is alleged to have engaged in wrongdoing."  (Id. at 8-9.)[9]

Fannie Mae responds that at this juncture, the purported remedy limitation of

---

[9]     The Moving Defendants also contend that Fannie Mae has not availed itself of the option of requesting, as a "Contingent payee" under the Cook Islands Trust, payment for a final judgment against Grossman.  (Id. at 3-4.)  But that option provides no real avenue of satisfaction for Fannie Mae in light of the fact that the trustee is not obligated to comply with any such request.  (Doc. No. 61, at 19 n.12 (explaining that "[u]nder Grossman's Cook Island Trust scheme, the Trustee can do whatever he pleases").)  Moreover any such provision in the Trust, which is not a contract to which Fannie Mae was a party, does not preclude Fannie Mae from pursuing its remedies under the Fraudulent Transfer Act.

Section 322B.32 (and its Delaware counterpart) is not yet relevant.  Fannie Mae seeks to have the transfers of Grossman's membership interests set aside and ownership restored in Grossman's name.  "Once Fannie Mae proves liability for a fraudulent transfer, § 322B.32 may be relevant to possible remedies from which the Court could select; only at that time would the 'exclusive remedy' language in § 322B.32 have any potential application."  (Doc. No. 61, at 18.)[10]

With respect to the charging order remedy, the Court understands this remedy-limitation provision as a means of effectuating the "pick your partners" doctrine.  E.g. 6B Uniform Laws Annotated (2008), Revised Uniform Limited Liability Act (2006) Prefatory Note, at 412.  A member of an LLC (or a partner in a partnership) has two distinct interests:  (1) a right to distributions from the entity; and (2) a right to participate in the management of the entity.  By limiting a creditor of a debtor-member to a charging order, the statute ensures that "judgment creditor status does not give a non-member creditor any right to become a member of a limited liability company or to exercise governance rights."  Minn. Stat. § 322B.32, Reporter's Notes, 1992.  As the Comment to

---

[10]    The Moving Defendants thus contend that Fannie Mae is arguing that their motion to dismiss the LLC Defendants is a premature request to limit its remedies.  (Doc. No. 75, at 7 n.4.)  Relying on Chrysler Credit Corp. v. Peterson, they assert that a creditor such as Fannie Mae is not only limited to a charging order, but that such an order may be issued even though the debtor's interest in an entity such as a partnership or a LLC would not yet be determined.  342 N.W.2d 170 (Minn. App. 1984) (explaining that court need not wait to issue charging order until determination of the ownership of the transferred interest).  In short, they contend that because there is no need to wait to issue such an order, there is no basis now to defer limiting Fannie Mae to that remedy.  But here, under these facts, before any final determination of the merits, there is no present need to limit the scope of Fannie Mae's potential relief under the Uniform Fraudulent Transfer Act.

the relevant provision of the 2006 Uniform Law provides,

> [t]his section balances the needs of a judgment creditor of a member or
> transferee with the needs of the limited liability company and the members.
> The section achieves that balance by allowing the judgment creditor to
> collect on the judgment through the transferable interest of the judgment
> debtor while prohibiting interference in the management and activities of
> the limited liability company.

Revised Uniform Limited Liability Company Act (2006) § 503, cmt.

Here, Fannie Mae's request for relief does not disclose any intent to become a
member of the LLC Defendants or to otherwise exercise governance rights in those
entities.  Rather, it simply seeks to have its judgments satisfied, primarily by having the
transfers of Grossman's membership interests in the LLC Defendants declared void *ab
initio*, such that the subsequent "distributions" by the LLC Defendants to the Trust as the
purported new member would also be void.  Neither remedy would interfere with the
LLC's management or activities.  Moreover, should Fannie Mae prevail in this action by
establishing that the transfers were in fact fraudulent, the Court can fashion any relief it
might grant so as not to intrude upon the management of those entities.

In sum, insofar as the Moving Defendants presently seek to limit Fannie Mae's
remedy to a charging order, their motion for summary judgment must be denied.

## C.      Grossman And The LLC Defendants

The Moving Defendants further argue that the LLC Defendants should not be
parties to this action because Grossman, as the debtor in this fraudulent transfer action, is
the only appropriate defendant.  But as will be explained, the LLC Defendants are
additional debtor-defendants in this action because the facts support an inference that

Grossman operated them as mere extensions of himself in attempting to shelter his assets following a judgment against him personally.  Under the doctrine of reverse veil piercing, in an action against an individual who owns or controls an entity that would otherwise be separate from its owners or managers, the entity may lose its separate status as such if the individual manipulated the entity for his own personal purposes.  United States v. Scherping, 187 F.3d 796, 801-02 (8th Cir. 1999).  And in a fraudulent transfer action, an entity he has thus abused is a valid additional defendant.  P.H.T. Systems, Inc. v. Tropical Flavors, Inc., 2006 WL 1516022, *1-4 (Minn. App. May 30, 2006).

The Moving Defendants contend that Minnesota's fraudulent transfer statute "provides for relief *only* against debtors and transferees," and that the LLC Defendants are not "even alleged to be debtors of Fannie Mae or the recipients of any fraudulent transfers."  (Doc. No. 75, at 1 (emphasis in original).)  In short, they assert that their motion is not a premature request to determine permissible remedies, but rather a timely motion to remove the LLC Defendants as they "should not be parties to this proceeding *at all*."  (Id. at 1-2 (emphasis in original).)

The Moving Defendants contend that Grossman is the only debtor and thus that the only assets at issue here, Grossman's membership interests in the LLCs, are Grossman's property, which are separate and distinct from the LLC Defendants' property.  (Id. at 2-3.)  They correctly note that a limited liability company may own property, Minn. Stat. § 322B.20, subd. 4, and that a "member has no interest in specific limited liability company property," which "is property of the limited liability company itself," id. § 322B.30, subd.

1.

The Moving Defendants thus rely on the assertion in the Complaint that, as Defendants characterize it, Fannie Mae "only seeks relief to the extent Grossman transferred his 'personal assets.'"  (Doc. No. 75, at 3 n.1.)[11]  Here, in contrast, the Moving Defendants assert that they did not participate in transferring Grossman's own assets, that is, his memberships interests, and that with respect to the subsequent distributions by the LLCs to the trust, "[t]he LLC Defendants transferred only their own assets to the Trust." (Id. at 4-5.)

In sum, the Moving Defendants contend that the MUFTA permits a court "to impose liability only on the debtor or the first transferee."  (Id. at 5.)  And with respect to Grossman's transfer of his membership interest in each of the LLC Defendants, which was Grossman's personal property, "the LLC Defendants have no leverage to demand a return of" such property, "which they had no part in transferring in the first place."  (Id. at 6.)  The Moving Defendants thus seek dismissal of the LLC Defendants from the action.

But insofar as the Moving Defendants request that the LLC Defendants be dismissed outright from this action, their motion must likewise be denied.  Granted, the

---

[11]     In addition, they argue that the cases on which Fannie Mae relies concerned situations where the non-debtor "defendant assisted in fraudulently transferring the *debtor's* property."  (Doc. No. 75, at 4 (emphasis in original) (addressing five cases regarding parties that have conspired with the debtor, or aided and abetted the debtor).)  They further argue that those cases are from jurisdictions that, unlike Minnesota, expressly have recognized claims for either aiding and abetting a debtor's fraudulent transfer or for conspiring with a debtor to fraudulently transfer property.  (Id. at 5.)  This issue is academic, however, because the Court's decision here does not rely on a theory of conspiracy or of aiding and abetting.

Complaint, which was filed on November 26, 2012, alleges that Grossman transferred *his* property, that is, his membership interests in the LLC Defendants, to the Cook Islands Trust.  Only since then, however, did Fannie Mae learn through discovery that Grossman–in his capacity as "manager" of the LLC Defendants–*also* transferred funds that were the property of the LLC Defendants to the Cook Islands Trust as the purported new member of the LLC Defendants.  (Doc. No. 61, at 7.)  And because Grossman himself (along with the Grossman Trust) is the beneficiary of the Cook Islands Trust, "[o]nce the funds make their way off shore to the [Cook Islands Trust], it is Grossman who is the 'beneficiary.'"  (Id. at 8-9.)[12]

Fannie Mae's inclusion in this action of the non-debtor LLC Defendants for, as the Moving Defendants characterize it, "transferring property in which the debtor has absolutely no property interest" would not thereby "turn fraudulent-transfer law on its head."  (Doc. No. 75, at 4.)  Fannie Mae is not contending that Grossman, simply by virtue of his being a member of the LLCs, thereby held any ownership interest in any of the LLC's assets.  As counsel for Plaintiff explained at oral argument, any distributions made by any of the LLCs of entity profits or other assets would become the property of

---

[12]     There seems to be little doubt that the subsequent transfers offered Grossman further protection from creditors by, in addition to sheltering his membership interests offshore, sheltering the assets of the LLCs–which remain entities formed under Minnesota and Delaware law and were conducting their business here in the United States–in the same offshore haven.  Thus, even if a creditor could "claw back" the debtor's ownership interests in an LLC and obtain a charging order so as to receive the debtor's share of the LLC's distributions, there would likely be little, if anything, for the LLC to distribute to the creditor unless the LLC's distributions to the Trust were also clawed back.

its members upon distribution.[13]  Granted, Grossman no longer would be getting such

distributions after he transferred his membership interests to the Cook Islands Trust.[14]

Nevertheless, Grossman, although not the trustee of that Trust, is a beneficiary (along

---

[13]     Generally, members of an LLC are entitled to a proportionate share of the "profits and losses of a limited liability company," Minn. Stat. § 322B.326, as well as a proportionate share of the "distributions of cash or other assets of a limited liability company, including distributions on termination of the limited liability company," id. § 322B.50.  "The right to share in profit and losses and the right to distributions are always linked," as a "member's distribution rights determine when the member will receive any net profit allocated to the member."  Id. § 322B.50, cmt.  Nevertheless, "[t]he right to share in profits and losses and the right to share in distributions are conceptually separate aspects of a member's financial rights."  Id. § 322B.31, cmt. subd. 1.

[14]     The record is not entirely clear on what precisely Grossman transferred to the Trust.  As discussed above, a member may freely transfer his "financial rights"–essentially his right to profits and other distributions–but transfer of his "governance rights" is much more restricted.  See supra note 2.  And, generally, a transfer of governance rights "is effective only if all the members, other than the member seeking to make the assignment, approve the assignment by unanimous written consent." Minn. Stat. § 322B.313, subd. 2.  A transfer of only "financial rights" would not thereby result in the transferee becoming a member of the LLC.  Id. § 322B.31, subd. 2.  With respect to ABCO, Grossman transferred to the Trust–for "a hundred dollars and for other good and valuable consideration"–"all of the rights, title and interest of Grossman in ABCO." (Doc. No. 85, Ex. 7, at 16-17 (Depo. at 53:12 –54:4).)  Yet he seems not to be sure whether, as a result of that transfer, he is still a member of ABCO.  (Id. at 7 (Depo. at 17:16-17 ("Not to my knowledge.")).)  But Grossman refers to the Trust as presently being a member of both Ambient and ABCO.  (Id., Ex. 6, at 6-7 (Depo. at 12:3 – 17:8); id., Ex. 7, at 7 (Depo. at 16:8-17), 11 (Depo. at 32:17 – 33:8).)  Nevertheless, Grossman, who continues to be the "manager" of the LLC Defendants, appears to have retained control over the LLCs.  (Id., Ex. 6, at 14 (Depo. at 44:25 – 45:20 (stating that the Trust has not been involved in the management of Ambient after Grossman transferred his "membership interest" in Ambient to the Trust and that he remains the "decision-maker" even after that transfer)).)  And with respect to Grossman's purported transfer of his "membership interest" in Ambient to the Trust, he "can't recall" whether the other members executed any written agreement consenting to that transfer.  (Id. (Depo. at 46:24 – 47:19).)  On the present record, the Court can not preclude a finding that Grossman transferred only his financial rights to the Trust.  For convenience, however, the Court will refer, for purposes of the present motion, to the Trust as having become the "purported new member" of the LLCs.

with the Grossman Trust).  Moreover, insofar as those transfers would be found to be fraudulent, and thus subject to being voided *ab initio*, ownership of Grossman's membership interests in the LLC Defendants would be deemed to have remained with the debtor and the ensuing distributions to the purported new member, the Trust, would also be voided *ab initio*.

In addition, the Moving Defendants' focus on the property of an individual debtor versus the property of an entity such as an LLC in which the debtor has (or had) some interest assumes that every fraudulent transfer of membership interests in an LLC is conducted by a debtor who is simply a "member" of an LLC but lacks any governing or managerial capacity in that entity.  See supra note 1 (summarizing "members," "managers" and "governors" of an LLC).  Here, however, Fannie Mae contends that "Grossman controlled, directed, and/or participated in each LLC Defendant transfer of funds to the" Cook Island Trust.  (Doc. No. 61, at 8.)  The record presently before the Court appears to confirm as much.  Grossman was not simply "a" member of the LLC Defendants.

### 1.    Ambient

With respect to Ambient, for example, Grossman held an eighty-nine percent interest in that entity.  (Doc. No. 85, Ex. 6, at 9 (Depo. at 26:7 – 27:11).)  He also holds other positions of control in and over the LLC Defendants.  For example, he is the sole board member of Ambient and the other members hold only non-voting interests and do not participate in the management and operation of Ambient in any material way.  (Id. at

10 (Depo. at 28:5-25 –29:8).)[15]

With respect in particular to the distribution Ambient made to the Trust, although Grossman asserts that the Cook Island Trust was the one who requested that the distribution be made to it, his testimony is rather shaded on this point.  (Id. at 6 (Depo. at 13:5-6 ("The distribution was made because that member wanted that distribution. . . . Q: Did the trust make a request to the company?  A: In effect, yes.")).)  Grossman testified that "[t]he trust, in discussions at the time the trust was set up, there was an understanding achieved that the member would prefer excess distrib [sic] - - excess cash to be distributed to the member."  (Id.)  Thus, Grossman, in response to the question whether the distribution was made at his direction, states:  "Well, it was made at the - - I would say it was made at the direction of" the Trust.  (Id. at 8 (Depo. at 22:9-15).)  And while he purports to clarify that he does not "remember specifically when [the request was made] and exactly who did it," Grossman nevertheless "did have a clear understanding of" the Trust's objectives.  (Id.)

But most importantly, Grossman then testified that only he would "be the one to be making [a] decision" with "respect to distributions to members."  (Id. at 17-18 (Depo. at 59:23 – 60:4); see id. at 13 (Depo. at 41:11-18 (explaining that Grossman alone made the

---

[15]     And Grossman remains the "manager" of each.  (Id. at 8-9 (Depo. at 23:25 – 24:9).)  With respect to ABCO, although Grossman transferred his membership interest to the Cook Islands Trust in 2008, he remains the manager of that LLC.  (Id., Ex. 7, at 7 (Depo. at 17:18-20), at 20 (Depo. at 70:9-11).)  And while Grossman transferred his membership interest in Venerable to the Trust at the same time, he likewise remains its manager.  (Id., Ex. 8, at 7 (Depo. at 17:23-24).)  And in their respective Rule 30(b)(6) depositions, each of the LLC Defendants designated Grossman to testify on their behalf, presumably by Grossman himself acting as manager of each of the entities.

determination of what amount to distribute to the Trust)).)  And any decision to distribute excess cash of Ambient presumably would be made by Ambient, not by any particular member simply requesting such a distribution.  As noted above, Grossman maintains that the Trust exercises no managerial functions with respect to Ambient.  Rather, Grossman remains the manager of that entity, that is, the one "in charge of running the company." (Id. at 8 (Depo. at 23:6-13).)  And, in fact, Grossman stated that if there would be a decision in the future to make additional distributions to the Trust, such a decision would "[l]ikely" be made by himself.  (Id. at 14 (Depo. at 45:17-20).)  The Court also notes that while a cash distribution actually was paid to the Trust, the other members of Ambient did not likewise receive any cash distribution.  (Id. at 6 (Depo. at 12:14-20 ("Distribution [to the other members] was booked, but not made, no. . . . [Booked] [a]s a distribution receivable.")); id. at 11 (Depo. at 34:4-13 (stating that he could not recall if the other members received any distributions from "time to time")).)[16]

In sum, the Court can not conclude that Grossman, as manager of Ambient, simply acquiesced in the Trust's request for a distribution, much less that he would be obligated to comply with any such request.  On this record, there is at least a genuine issue of fact as to whether Grossman retained, even after the transfer of his membership interests to the Trust, the authority to decide whether to make a distribution to Ambient's members.

Moreover, Grossman stated that his duties and responsibilities at Ambient have not

---

[16]     Although, as Grossman suggested, there may be nothing improper about such a procedure as a matter of LLC law, here it is suggestive of the manager using the LLC for his own personal purposes.

changed since the 2008 transfer of his membership interest.  (Id. at 8 (Depo. at 23:17-24).)  In fact, his "level of involvement and participation in Ambient's business affairs has not changed" since that transfer.  (Id. at 11 (Depo. at 33:9-13).)  Yet while Grossman would no longer be receiving distributions from Ambient after the transfer, he–despite still "running the company"–"take[s] no wages or salary. . . .  I never have."  (Id. at 11 (Depo. at 32:25 – 33:5).)  The fact that a manager of an LLC who is no longer a member of that entity, and thus would not be entitled to any distributions, receives no salary or other compensation supports the inference–absent any plausible explanation as to why the manager would now work for free–that such a manager is deriving some beneficial interest by managing that company.

In sum, there is no dispute that Grossman established the Trust with himself as a beneficiary, assigned his LLC interests to the Trust, and then, acting as manager of Ambient, distributed Ambient's excess cash to the Trust.  And it appears that despite the transfer of his membership interests to the Trust, Grossman employed his retained authority over the LLC Defendants to further his own individual interest by sheltering from Fannie Mae what would otherwise have become his personal assets–and thus subject to a charging order–by distributing them to the offshore Trust.[17]

### 2.    ABCO

---

[17]    The fact that Ambient has employees does not preclude a determination that Grossman has disregarded the entity status of the company.  That issue is a question of how the owners of an entity treat and operate the company, that is, whether the owners respect the separateness of the entity, or whether they treat it as a mere extension of themselves individually.

With respect to ABCO, which was in receivership by the time of oral argument in this matter, a similar situation is evident.  Although ABCO, which is a business entity that licenses patents covering certain dental inventions, has no employees, Grossman has one "partner," that is, another member besides Grossman, but the other member, Mr. Hasel, has no "involvement with the books and records," as Grossman is "the business guy," while the other member is "the inventor."  (Doc. No. 85, Ex. 7, at 5 (Depo. at 10:5 – 11:16).)  Yet he then also acknowledged a third member, namely Venerable.  (Id. at 7 (Depo. at 16:18-22 ("and I suppose Venerable")).)  Although Grossman transferred his "membership interest" to the Cook Islands Trust, and thus is not "to [his] knowledge," presently a "member" of ABCO, he is the "manager" of the entity.  (Id. at 7 (Depo. at 17:16-20), 12 (Depo. at 37:23 – 38:4).)  Grossman defined his duties and responsibilities in that role as those "of the business manager of the company," making "business decisions as needed."  (Id. at 20 (Depo. at 70:21 – 71:2).)  While Grossman asserts that he is no longer a member of ABCO and thus not entitled to any member distributions, he also states that he is not paid any salary for his continuing services as manager of that entity.  Again, absent any evidence explaining why a manager would work for free, such facts support at least an inference that a manager of an LLC who is not a member of that entity, and thus not entitled to any distributions, continues to derive some beneficial interest from that company through his role as manager.  Grossman suggested as much, before backing away from acknowledging any such interest.  (Id. at 21 (Depo. at 75:6-24 ("Q:  Do you get paid any form of compensation?  A:  Not per se.  Q: . . . what does that

mean?  A: Well, I guess the answer would be no, I don't.")).)

In addition, ABCO does not have any "formal" meetings of the members.  (Id. at 20 (Depo. at 71:8).)  While Grossman purports to communicate with Dr. Hasel as a member of ABCO (id. (Depo. at 71:10-13)); id. at 11 (Depo. at 32:24 – 33:4 (explaining that distributions to members vary from their respective interests "based on verbal agreement")), he also testified that "[i]t's been a long time" since he spoke with Hasel and that he does not "have the specific recollection of a conversation" with Hasel (id. at 13 (Depo. at 40:14 – 41:4)).  And while such decisions are apparently made in consultation with Mr. Hasel, Grossman's hedged and nuanced testimony regarding whether he and Hasel talk "about how it is divvied up" (id. at 11 (Depo. at 35:13-18) ("In a manner of speaking.")) raises an inference that Grossman alone makes those decisions.  Despite their purported business relationship, Grossman knows only that Hasel lives in California, claiming he does not have Hasel's address, even what city he resides in, or telephone number.  (Id. at 12-13 (Depo. at 39:17 – 40:5).)

Similarly, while Grossman asserts that the Trust is a member of ABCO since the 2008 transfer of his membership interest, he does not communicate with that member "directly."  (Id. at 20 (Depo. at 71:16-21); id. at 21 (Depo. at 72:24 – 73:6 ("As I said, there was very little communication with the trust.")).)  And with respect to ABCO's subsequent distributions to the Trust, Grossman does not "recall talking directly to the trust about that."  (Id. at 13 (Depo. at 43:4-25).)  Grossman further testified that he communicates with the Trust about anything "[v]ery rarely, if ever."  (Id. at 14 (Depo. at

44:4-6.)  In fact, he "can't think of anybody that [he has] spoken to there."  (Id. (Depo. at 44:7-10).)  Nor does Grossman think he has communicated with the Trust in writing.  (Id. (Depo. at 44:11-13).)

### 3.    Venerable

And with respect to Venerable, while Grossman asserts that he remains the manager of that company, he cannot recall with any accuracy who presently are the members of that entity.  (Id., Ex. 8, at 4 (Depo. at 7:3-13).)  He can not even recall whether there has been any meeting of the members of Venerable, or written communications between the members, since he transferred his interest in that entity to the Trust in 2008.  (Id. at 7 (Depo. at 18:3 – 19:3).)  Grossman acknowledges two payments by Venerable to the Cook Islands Trust, totaling $95,000, but states that he does not know the reason for those payments.  (Id. at 19 (Depo. at 64:4-23).)  He concedes that he–"probably"–was the one who directed those payments, but he "just [does not] recall the specifics of it."  (Id. (Depo. at 64:12-14).)  Grossman also acknowledges Venerable received funding from Ambient in 2011, but can not recall "the reasons for [that] funding," except that $275,000 "went to [himself]."  (Id. (Depo. at 65:12 – 66:9).)  He further acknowledges that he, as manager, made the determinations to pay himself those funds.  (Id. at 66:10 – 67:7).)

### D.    Reverse Veil-Piercing

The record thus discloses at least a *prima facie* case for disregarding the separate entity status ("the corporate veil") of the LLC Defendants, so as to effect a "reverse" veil

piercing, particularly outsider (creditor) reverse piercing.[18]  Whereas in the conventional

veil-piercing context a plaintiff seeks to disregard the separateness of an entity defendant

in order to reach its owners, "[i]n a reverse piercing action, however, the claimant seeks

to reach the assets of a corporation or some other business entity, . . . to satisfy the claims

or a judgment against a corporate insider."  C.F. Trust, Inc. v. First Flight Ltd.

Partnership, 580 S.E.2d 806, 810 (Va. 2003) (holding, on question certified from the

Fourth Circuit, that Virginia recognizes the concept of outsider reverse piercing, and

noting that nothing in that state's limited partnership statute, which contained a charging-

order provision, "prohibits a court from piercing the veil of a limited partnership").

In United States v. Scherping, 187 F.3d 796 (8th Cir. 1999), the Eighth Circuit

applied outsider reverse piercing in order to facilitate a creditor's satisfaction of debts

owed by two taxpayer debtors.  The plaintiff obtained judgments against two brothers for

failure to pay their taxes.  The plaintiff then brought a collection action against not only

the two brothers, but also the wife of one brother as well as two business trusts the

brothers had created.

The Eighth Circuit, applying Minnesota law of "alter ego" corporate veil piercing,

expressly rejected the taxpayers' arguments that (1) "Minnesota courts would not extend

---

[18]     The limitation of a creditor of a debtor member to a charging order "is not
intended to prevent a court from effecting a 'reverse pierce' where appropriate."  Revised
Uniform Limited Liability Company Act (2006) § 503, cmt. (citing Litchfield Asset
Mgmt. Corp. v. Howell, 799 A.2d 298 (Conn. App. 2002)).  Minnesota recently enacted
the Revised Act in April 2014, with an effective date, generally, of August 1, 2015.  But
as discussed above, Minnesota's current version of the law governing LLCs already
recognizes the concept of veil-piercing.

the alter ego doctrine as a creditor's remedy beyond its traditional context," (2) that Minnesota cases applying reverse piercing doctrine concerned "insider" reverse piercing, and (3) even if Minnesota courts would extend reverse piercing to the "outsider" context, the doctrine should not apply on the facts of that case. Id. at 801. The court held that the two trusts created by the debtors "were sham entities created on behalf of and used by taxpayers to evade payment of their federal income tax liabilities." Id. at 802.

Looking "to state law to determine whether an entity is an alter ego of a taxpayer," the federal court applied Victoria Elevator Co. v. Meriden Grain Co., 283 N.W.2d 509 (Minn. 1979). "Minnesota courts, since *Victoria Elevator*, have employed a two-step analysis. In the first step, the court considers the relationship between the individual and the entity," focusing on various factors such as a failure to observe entity formalities, the absence of entity records, and the existence of the entity as a mere facade for the individual. 187 F.3d at 802. "'Disregard of the . . . entity requires not only that a number of these factors be present, but also that there be an element of injustice or fundamental unfairness.'" Id. (quoting Victoria Elevator, 283 N.W.2d at 512). "Thus, in the second step, the court considers the relationship between the entity and the party that seeks to disregard it; only if the entity has operated in a fraudulent or unjust manner toward that party will the entity be disregarded." Id.

After applying the test to the facts of that case, the Eighth Circuit found that the "present case meets the standards established by" Minnesota law. Id. at 803-04.[19] The

---

[19]    The Eighth Circuit noted that the taxpayer debtors had cited Minnesota

(continued...)

court noted that "there are strong policy reasons for reverse piercing the corporate veil in the present case, that is, avoiding fraud and collecting delinquent federal taxes." Id. at 804.[20]

Here, too, the facts support at least a *prima facie* case that Grossman operates the LLC Defendants as mere extensions of himself, rather than as business entities separate from their owners and officers. In fact, the record is replete with testimony that Grossman–despite his continuing role as the business manager of these entities, much less his obligation as their Rule 30(b)(6) designee–has little recollection of the major recent

─────────────────────

[19](...continued)
cases that had "rejected attempts to apply the reverse piercing doctrine as a creditor's remedy." Id. at 803. In Potpourri Health Foods Trust v. Sherping and Imperial Investments, 1992 WL 71996 (Minn. App. 1992), the court–in an action involving the same debtors at issue in the later federal action–rejected the creditor's attempt to collect from a corporation, Imperial Investments, which had purchased the debtor's farm in an arms-length transaction. The court explained that there was no legal basis "to impose liability upon a corporation for unrelated debts of individuals who hold no ownership or management roles in the corporation." Id. at *1 (noting that corporate CEO had stated that "the Sherpings had never been shareholders, officers or directors of" the corporation, and stating that "[t]he record is devoid of evidence that the Sherpings had any control over Imperial"). In short, the Minnesota court did not reject the doctrine of outsider reverse piercing outright, but rather simply found that the facts there did not warrant its application. Similarly, in Stoebner v. Lingenfelter, 115 F.3d 576 (8th Cir. 1997), the Eighth Circuit refused to apply reverse veil-piercing not because Minnesota has rejected the doctrine outright, but because there the "approach" of the party seeking its application was "inconsistent with the proper application of the doctrine." Id. at 579. As the court explained, "Minnesota courts do not apply the doctrine where nonprincipals, such as [the entity's] innocent creditors, will be harmed." Id. Here, however, because this Court does not anticipate issuing any damages award against the LLCs, any innocent creditors of those entities could not be harmed. Nor would any other member of the LLC Defendants be harmed if Fannie Mae succeeds in having the funds that the LLCs distributed to the Trust returned to the LLCs.

[20]    Although the present action is not one to collect federal taxes, the federal government placed Fannie Mae into conservatorship in September 2008.

business transactions conducted by these entities, at least without having the relevant documents in front of him at the depositions.  But with respect to company documents, Grossman rarely retains such materials.  (<u>E.g.</u> Doc. No. 85, Ex. 6, at 12 (Depo. at 39:9–18.)

Furthermore, Grossman's testimony is consistently evasive and hedged.  Despite remaining as the manager of Ambient after the transfer of his membership interest in that entity to the Trust, as well as a member of the board of governors, he seems unsure whether Ambient's board has other members.  (<u>Id.</u> at 10 (Depo. at 28:5-10 ("I think I'm the only, the sole board member.")).)

Similarly, he is unable to provide a clear, direct answer about his own present role at Venerable.  (<u>Id.</u>, Ex. 8, at 7 (Depo. at 17:23 – 18:2 ("Q:  Are you still the manager at Venerable?  A:  I believe I am.  Q:  You believe you are?  A:  To the best of my knowledge I am.")).)  Having not reviewed much, if any, of the relevant LLC documents in preparation for his testimony as the designated deponent for those entities, and despite his obligation as a Rule 30(b)(6) witness to do so, Grossman relied on his "bad memory"[21]:  "A: Well, I don't recall the specifics behind the assignment.  I'd have to go back and search my recollection.   Q: Well, why don't you search your recollection as we sit here.  A: As I sit here right now, I don't recall anything.  Q:  So if you're going to search your recollection, what would you search?  A: I would continue to search my brain to see if I recalled over time, or see if I could find anything, which I doubt I could, but –."

_____

[21]        "A:  Again, I'm relying strictly on my very bad memory, yes.   Q:  So your memory's still bad.  A:  It's still bad."  (<u>Id.</u> at 9 (Depo. at 27: 3-6).)

(Id. at 20-21 (Depo. at 71:20 – 72:7).)

Moreover, it is clear that the four LLC Defendants had an "informal," if not exceedingly casual, relationship with each other and that Grossman's relationship with the entities was similarly casual.  For example, it appears that Ambient frequently loaned funds to Venerable, although–again–Grossman's memory is poor.  (Id., Ex. 6, at 18 (Depo. at 62:18 – 63:9 ("I can't recall specifically, but it wouldn't surprise me if that were the case . . . because, looking back, you know, money moved from Ambient to Venerable over time.")).)  But "[i]t was an informal arrangement."  (Id. (Depo. at 63:13).)  And the requests from Venerable were both written and oral.  (Id. at 20 (Depo. at 69:10-14).)  In short, because Grossman was the manager of both entities, he "asked [himself] for money on occasion."  (Id. at 19-20 (Depo. at 67:21 – 68:20).)  But Grossman could not identify any of those transactions as appearing on the financial statements.  (Id. at 22-24 (Depo. at 79:2 – 84:17).)  And with respect to the repayment terms, Grossman was "not sure what the arrangement is" and "not sure what the obligation is to repay, if any."  (Id. at 24 (Depo. at 85:7 – 86:13).)

And while he asserts that he is neither an employee of, nor a consultant for, Venerable, only its manager, he acknowledges that he receives money from Venerable "on a periodic basis," but is unable to answer whether that constitutes "pay" or "compensation."  (Id., Ex. 8, at 11 (Depo. at 32:11 – 33:10).)[22]  All while maintaining that

---

[22]     He later acknowledges receiving $1,293,408.11 for "serv[ing] as manager," but is unable to confirm that these funds were "compensation for being manager" or "salary," and or that he would be considered an "employee" of Venerable.  (Id. at 13

(continued...)

as the manager of that entity he is involved with the financial affairs of the LLC.  (Id. (Depo. at 34:2-25).)  Yet he can not "recall that there were any transfers to the trust from Venerable."  (Id. at 12 (Depo. at 38:7-12).)  Nor can he specifically recall "the source of funds to Venerable from which" he was paid.  (Id. at 14 (Depo. at 44:19-22).)

Finally, it is clear that Grossman's various roles–as himself individually, and as the manager of the four LLC Defendants–blur into each other.  (Id., Ex. 8, at 8 (Depo. at 21:9 – 22:11 (explaining Venerable's knowledge and understanding of the transfer of Grossman's interest in that entity to the Trust)), at 16 (Depo. at 55:4-15 (explaining that with respect to Ambient's funding of Venerable, he, as manager of Venerable, communicated with Ambient–i.e., with himself:  "Well, I don't remember the specifics, but I would assume that I was involved for Ambient as well.").)  Likewise, the LLCs themselves were not kept strictly distinct.  Having previously denied that Venerable has any employees, he later acknowledges that one "Marcy" is an employee–"Yes, I think technically she is, yes"–and testifies that "Venerable uses the Ambient payroll system to pay and track Marcy's – to pay Marcy and track the pay."  (Id. at 26 (Depo. at 92:11 – 93:6).)

Because the present record supports at least a *prima facie* case for disregarding the separateness of the LLC Defendants, the LLCs–by virtue of being mere extensions of Grossman personally–are additional judgment debtors and, therefore, proper parties to

---

[22](...continued)
(Depo. at 42:9 – 43:18) ("Um, again, depending on how you define compensation.  The proceeds were related to my being the manager.")).)

this action.  As the Minnesota Court of Appeals explained in the context of conventional

veil-piercing, it upheld the district court's order joining two individuals as judgment

debtors, under Minn. Stat. § 513.47(a)(3)(iii), in a creditor's fraudulent transfer action

against a corporation against which the creditor previously had obtained a judgment for

an unpaid debt.  P.H.T. Systems, Inc. v. Tropical Flavors, Inc., 2006 WL 1516022 (Minn.

App. May 30, 2006).  The two individuals were the CEO and majority shareholder,

respectively, of that corporation.  After the creditor obtained that judgment, an LLC was

organized with one of those two individuals as its CEO and sole shareholder.  The debtor

corporation then transferred its sole asset to the LLC.

On appeal, the court first concluded that the transfer by the corporation of its sole

asset to the LLC was fraudulent within the meaning of Minn. Stat. § 513.44.  2006 WL

1516022, at *3.  The court also concluded it was not an abuse of discretion to hold the

two individuals, who were the CEO and the majority shareholder of the transferor

corporation, respectively, personally liable for the corporation's fraud in transferring its

sole asset to the LLC.  Id.  Accord Rogers v. Meldahl, 2002 WL 31057010, *1-2 (Minn.

App. Sep. 17, 2002) (concluding that it was not improper to add judgment debtor's

corporation as an additional defendant and judgment debtor).

Here, the same principle applies in the context of outsider reverse veil-piercing.  In

short, the present action is not the garden variety fraudulent transfer case limited to a

debtor transferring *his* membership interests.  Thus, the Moving Defendants argument that

the LLCs are neither debtors nor transferees–that "none of the LLC Defendants here

participated in the transfer of Grossman's own assets to any third party" (Doc. No. 75 at 4)–fails to acknowledge the actual role of the LLCs in the transactions at issue and Grossman's use of his control over them for his own personal benefit. Even if the LLC Defendants were not involved in Grossman's transfer of *his* property–his membership interests in those entities–the present record could support the conclusion that the LLC Defendants–at Grossman's direction and for his benefit–were involved in the transfer of *entity* property, namely profits generated by the LLCs, as cash distributions to what is now the purported new member of the LLCs, namely the Cook Islands Trust. And, of course, Grossman is a beneficiary of that Trust.

The Court clarifies that it is not retaining the LLC Defendants as parties because it anticipates awarding damages to Fannie Mae against those entities.[23] Rather, they would be retained in order to facilitate the primary form of relief that Fannie Mae seeks, that is, the voiding of the original transfers of the membership interests and, therefore, also the subsequent distributions that the LLC entities made to the Trust as the purported new member.

In sum, the Moving Defendants' motion for summary judgment must be denied insofar as the LLC Defendants seek dismissal from this action because, on the present record, those entities may be retained as additional debtor-defendants in a fraudulent transfer action where the debtor is not only a member of those entities but exercises

---

[23]     And Fannie Mae concedes that its request that Grossman's LLC membership interests be sold is not an appropriate form of relief under Minnesota's fraudulent transfer statute. (Doc. No. 61, at 2.)

control over them as mere extensions of himself and his personal interests.  On this record, there is at least a fact issue as to whether the LLC Defendants are *de facto* debtors under an outsider reverse veil piercing analysis.

### E.      Claim For Injunctive Relief

The Moving Defendants also seek summary judgment on Fannie Mae's claim for injunctive relief, contending that Fannie Mae's failure to move for such preliminary relief within the pre-trial order's deadline for dispositive motions renders the claim moot.  (Doc. No. 28, at 2, 9.)  In response, Fannie Mae contends that its claim seeks both preliminary and permanent injunctive relief and that it need not seek the former in order to obtain the latter.  The Moving Defendants dispute whether the claim extends to permanent relief, however, noting that the claim seeks certain specified forms of injunctive relief "during the pendency of this lawsuit."  (Doc. No. 75, at 8 (citing Doc. No. 1 ¶ 39).)  They also contend that the MUFTA permits a court to issue an injunction against further disposition of the relevant assets or other property only by the debtor or a transferee (or both) and that "the LLC Defendants are neither debtors nor transferees."  (Id.)

The Court first rejects Defendants' argument that seeking preliminary relief is required in order to obtain permanent relief.  E.g. Capitol Records Inc. v. Thomas-Rasset, 680 F. Supp. 2d 1045, 1059 (D. Minn. 2010).  Nor does the Court agree that the Complaint expressly seeks only preliminary relief.  Granted, the Complaint is somewhat less than perfectly clear and consistent in seeking "preliminary and permanent injunctions . . . that *during the pendency of this lawsuit*" Fannie Mae is entitled to certain specified

forms of injunctive relief.  (Doc. No. 1, ¶ 39.)  But a fair reading of the entire Complaint warrants the conclusion that Plaintiff sought permanent as well as preliminary injunctive relief.  (E.g. id. ¶ 37 & "Prayer for Relief".)  Indeed, the very nature of this action suggests that Fannie Mae seeks not only to prevent any further transfers of Grossman's assets pending the outcome of the action, but also, should Plaintiff ultimately prevail on the merits, to claw-back those transfers that already had been made as well as to preclude any such transfers in the future.

## III.   ORDER

Based on the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY ORDERED** that:

1.     Defendants' motion for summary judgment [Doc. No. 27] is **DENIED**.


Dated:   August 15, 2014                        s/ Susan Richard Nelson
                                              SUSAN RICHARD NELSON
                                              United States District Judge